**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

EDWARD HUGLER,[1] *acting*
*Secretary of Labor*, *Department of*
*Labor*,

                      **Plaintiff,**

          **v.**
                                        **1:15-CV-93**
                                        **(FJS/DJS)**

**DANIEL M. BYRNES and FORT**
**ORANGE CAPITAL MANAGEMENT, INC.**
**PROFIT SHARING PLAN,**

                      **Defendants.**
_____

**APPEARANCES**                  **OF COUNSEL**

**UNITED STATES**          **ALLISON L. BOWLES, ESQ.**
**DEPARTMENT OF LABOR**    **JEFFREY S. ROGOFF, ESQ.**
Office of the Solicitor         **DARREN J. COHEN, ESQ.**
201 Varick Street
New York, New York 10014
Attorneys for Plaintiff

**DANIEL M. BYRNES**
37 Columbine Drive
Glenmont, New York 12077
Defendant *pro se*

**SCULLIN, Senior Judge**

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Secretary of Labor, Edward Hugler, is automatically substituted as Plaintiff.

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiff brought this action against Defendant Daniel M. Byrnes pursuant to § 404(a)-(c) of the Employee Retirement Income Security Act ("ERISA"). These ERISA provisions impose a duty of loyalty, a duty of prudence, and a duty to diversify on trustees of ERISA-covered plans. *See* 29 U.S.C. § 1104(a)(1)(A)-(C). Pending before the Court is Plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See generally* Dkt. No. 40. Defendant opposes this motion. *See* Dkt. No. 45.

## II. BACKGROUND

Defendant owned and served as the president and CEO of Fort Orange Capital Management, Inc. ("Fort Orange") from 1996 until it went out of business in 2005. *See* Dkt. No. 40-2 at ¶¶ 1-5. The Fort Orange Capital Management, Inc. Profit Sharing Plan[2] ("the Plan") was established to provide retirement income for Fort Orange's employees. *See* Dkt. No. 40-1 at 2. Defendant was the Plan's sole trustee and exercised authority with respect to the management, administration, and disposition of the Plan's assets. *See* Dkt. No. 40-2 at ¶ 10. The Plan has not kept up with federal reporting requirements since 2002, nor has it issued individual benefits statements to plan participants since 2003. *See id.* at ¶¶ 12-13.

The Plan's resources have been held at Wells Fargo and other financial institutions. *See id.* at ¶ 16; *see also* Dkt. No. 45-2 at ¶ 16. In 2010, the Plan's assets grew from $195,616.01 to

_____

[2] The Plan is named as a Defendant only for "the purpose of ensuring complete relief among the parties under Federal Rule of Civil Procedure 19." *See* Dkt. No. 1 at ¶ 9.

$221,128.90. *See* Dkt. No. 40-2 at ¶ 20. In 2011, at the time of the first relevant investment, the Plan's assets totaled $227,565.94. *See id.* at ¶ 21.

Sarissa Inc. ("Sarissa") is a development stage mining project that owns various assets, including property in Canada with a niobium[3] deposit. *See id.* at ¶¶ 27, 39. Sarissa stock was traded on the over-the-counter market and was generally known as a "penny stock." *See id.* at ¶¶ 50, 56. Sarissa was on Wells Fargo's list of banned securities in 2011 and 2012. *See id.* at ¶ 54. Defendant has been a personal investor in Sarissa since 2008, and he and his family have more than $500,000.00 invested in the company. *See id.* at ¶¶ 59, 64.

In March 2011, Sarissa was attempting to raise up to $200,000.00 via a private placement. *See id.* at ¶ 72. That same month, Defendant, in his capacity as trustee, used $100,000.00 of the Plan's assets to purchase five million common shares of Sarissa at a subscription price of $0.02 per share. *See id.* at ¶ 82. The five million shares were restricted securities, meaning they could not be sold for one year. *See id.* at ¶ 85. Defendant relied on his "personal knowledge" of Sarissa in making the investment decision. *See id.* at ¶ 88. Defendant claims that he also consulted geological reports from the company and read about niobium as an asset. *See* Dkt. No. 45-2 at ¶ 88.

Again, in August 2012, Sarissa was attempting to raise up to $250,000.00 by private placement. *See id.* at ¶ 119. Defendant, acting as trustee, purportedly loaned[4] $120,000.00 from the Plan to Fort Orange (himself) to purchase six million shares of common stock in Sarissa at $0.02 per share. *See id.* at ¶ 129. However, the stock certificates named the Plan as the owner.

---

[3] Niobium is a mineral that is primarily used as a steel additive to make steel stronger and more flexible. *See* Dkt. No. 40-2 at ¶ 40.

[4] In the loan agreement, Defendant agreed to indemnify the Plan in the event of a loss but has not done so because he is not financially able to do so, and the collateral he posted for the deal has zero value. *See* Dkt. No. 40-5 at 237-38.

Defendant claims that he structured the deal as a loan because he did not want all the Plan's assets in "one basket"; but, when the stocks came back with the Plan's name, he decided that he would just leave it as is because "it was [the Plan's] money, so [it] should get the shares." *See* Dkt. No. 40-5 at 233. In deciding to invest the Plan's funds in 2012, Defendant reviewed the following: "(1) the Dominion Gulf Columbium Process; (2) a non-disclosure agreement [Defendant] and Sarissa signed; (3) Subscription Agreement for Common Shares; and (4) a press release announcing Sarissa's letter of intent to form a joint venture." *See* Dkt. No. 45-2 at ¶ 135. Defendant believed that the 2012 investment was "basically a risk-free opportunity" because Sarissa management told him that a Chinese deal was all set to go through. *See* Dkt. No. 40-5 at 235.

In total, the Plan has invested $220,000.00, or more than 95% of the Plan's total asset portfolio with Sarissa. *See id.* at ¶ 158. As of August 2012, only $8,227.79 remained in the Plan's Wells Fargo account. *See* Dkt. No. 40-1 at 7. According to a report that Plaintiff furnished, "[a]s a result of [Defendant's] investments in Sarissa, the Plan has experienced an unrealized loss of principal totaling $171,091.00 and another $143,727.00 in lost opportunity cost, or a total loss of $314,818.00." *See id.* (citing Dkt. No. 40-17 at 11-14).

Plaintiff initiated the instant action on January 26, 2015, alleging that Defendant "failed to discharge his fiduciary duty with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants of the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A)(i)." *See* Dkt. No. 1 at ¶ 51(a). Furthermore, Plaintiff alleged that Defendant "failed to discharge his fiduciary duty with . . . the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B)." *See id.* at ¶ 51(b).  Finally, Plaintiff contended that Defendant "failed to diversify the Plan's investments so as to minimize the risk of large losses, in violation 29 U.S.C. § 1104(a)(1)(C)." *See id.* at ¶ 51(c).

In the pending motion, Plaintiff requests that the Court issue an Order holding Defendant liable to the Plan for $314,818.00, as well as a permanent injunction removing Defendant as Trustee, appointing an independent trustee, and barring Defendant from serving as a trustee for this, or any other, ERISA-covered plan in the future.  *See* Dkt. No. 40-1 at 26.

## III. DISCUSSION

### A.       Standard of review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials "demonstrate the absence of genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the movant meets this burden, the nonmoving party must ""set forth specific facts showing a genuine issue for trial.""  *Id.* (quotation omitted).  The nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing [*Quarles*

*v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (*per curiam*)]).  "[I]n ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]"  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citations omitted).

**B.  ERISA breach of fiduciary duty**

"The elements of a claim for breach of fiduciary duty under ERISA are '(1) that defendant was a fiduciary who, (2) was acting within his capacity as a fiduciary, and (3) breached his fiduciary duty.'"  *Bd. of Trustees of Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 679 (S.D.N.Y. 2011) (quotation omitted).  The statute generally provides that "a person is a fiduciary with respect to a plan" and therefore subject to ERISA fiduciary duties, "to the extent [] he exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  "'Under this definition, a person . . . has [fiduciary] status only "to the extent" that he has or exercises the described authority or responsibility.'"  *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)).  There is no dispute in this case that Defendant was operating as a fiduciary for the Plan or that his decision to invest in Sarissa was made in his capacity as a fiduciary.

ERISA imposes several fiduciary duties, three of which are relevant to this litigation: (1) the duty of loyalty, (2) the duty of prudence, and (3) the duty to diversify.  See 29 U.S.C. § 1104(a)(1)(A)-(C).  Generally, Plaintiff alleges that Defendant breached ERISA's (1) duty of

loyalty by investing in a company in which he had a significant financial stake; (2) duty of prudence by failing properly to investigate whether investing in Sarissa was appropriate; and (3) duty to diversify by placing 95% of the Plan's assets in a single penny stock.

### 1. Duty of loyalty

Section 404(a)(1)(A) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of [] providing benefits to participants and their beneficiaries . . . ."  29 U.S.C. § 1104(a)(1)(A)(i). This is commonly known as a fiduciary's duty of loyalty.  Generally speaking, the fiduciary must make decisions "with an *eye single* to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) ("*Bierwirth II*") (citations omitted) (emphasis added).  However, "in the ERISA context, 'a conflict of interest alone is not a per se breach: "nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties."'"  *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 649 (S.D.N.Y. 2012) ("*State St. Bank & Trust*") (quoting *Tibble*, 2010 WL 2757153, at *18 (quoting *Friend v. Sanwa Bank of Cal.*, 35 F.3d 466, 468-69 (9th Cir. 1994))). "'Consistent with this rule, a fiduciary does not breach his duty of loyalty by pursuing a course of conduct which serves the interests of the plan's beneficiaries while at the same time "incidentally benefitting" the plan sponsor or even the fiduciary himself.'"  *Id*. (quoting *Tibble,* 2010 WL 2757153, at *18).  In short, any benefit to the plan's fiduciary must be incidental to a decision that is otherwise independently in the best interests of the plan participants.  *See id.*

The language of the statute, requiring that the fiduciary's "exclusive *purpose*" be for the benefit of plan participants, suggests that a court should use a subjective test when determining

whether a defendant has breached his duty of loyalty. *See* 29 U.S.C. § 1104(a)(1)(A) (emphasis added); *see also Tibble v. Edison, Int'l*, No. 07 Civ. 5359, 2010 WL 2757153, *24 n.19 (C.D. Cal. July 8, 2010), *vacated and remanded on other grounds*, 843 F.3d 1187 (9th Cir. 2016) (stating that "a breach of th[e] duty [of loyalty] requires some showing that the fiduciaries' decisions were motivated by a desire to serve the interests of [the fiduciaries] over those of the beneficiaries" (citations omitted)); *A.F. v. Providence Health Plan*, 173 F. Supp. 3d 1061, 1073 (D. Or. 2016) (citing [Peter J.] Wiedenbeck, [*ERISA in the Courts*], 165 [(Federal Judicial Center 2008)] ("In making the fiduciary's 'exclusive purpose' the touchstone, ERISA demands assessment of a conflicted decisionmaker's state of mind. Subjective purpose, of course, is necessarily inferred from objective facts.")). Under a subjective test, the court may rely on "circumstantial evidence and reasonable inferences" to determine whether a defendant was "attempting to also satisfy [his own] desires and needs" in making the investment. *Davidson v. Cook*, 567 F. Supp. 225, 236 (E.D. Va. 1983) (footnote omitted).

Plaintiff contends that, in 2011, Defendant decided to invest the Plan's assets in Sarissa to stimulate Sarissa's growth, thereby increasing the value of his significant personal investment in the company. Significantly, according to Plaintiff, prior to making the investments in Sarissa, Defendant had "abandoned his responsibilities with the plan" but was "actively involved in advancing Sarissa's well-being." *See* Dkt. No. 40-1. For example, Defendant knew that Sarissa's growth was limited by its ability to obtain capital, *see* Dkt. No. 40-5 at 152-53, 172-74, and that Sarissa was actively looking for capital in its 2011 private placement. Thus, Plaintiff asserts that the 2011 investment was meant to benefit Sarissa and its shareholders (of which he was one) by providing half of the capital it sought in the private placement and was not done with an "'eye

single to the interest of Plan participants and beneficiaries.'" *See* Dkt. No. 40-1 at 11 (quoting *Bierwirth II*, 680 F.2d. at 271).

Defendant, on the other hand, contends that he decided to invest in Sarissa in 2011 solely to benefit the Plan. In his deposition testimony, Defendant had the following exchange:

> Q. Did your personal investment have anything to do with the idea of investing— with your decision to invest The Plan's money?

> A. I wouldn't benefit because of that. I mean, The Plan -- I mean, I invested strictly because I thought it was a good investment for The Plan, not to benefit myself.

*See* Dkt. No. 40-5 at 198:14-21.

Defendant argues that the fact that he was personally invested in Sarissa is an "indicia of good faith and fulfillment of [his] duty of loyalty." *See* Dkt. No. 45 at 4.

With respect to the 2011 investment decision, although the record indicates that Defendant was convinced of the value of investing in Sarissa, as indicated by his own significant investment, it also shows that Defendant was completely inactive in managing the Plan *until* Sarissa needed an influx in capital. Defendant's only evidence that he invested in Sarissa for the exclusive benefit of the Plan is his own testimony that he considered what he perceived to be the long-term goals of the Plan participants. The overwhelming circumstantial evidence, however, shows that Defendant was personally invested in the success of Sarissa, financially and professionally, and did not make the investment decision thinking only of the benefit of the Plan. Therefore, the Court finds that the undisputed facts conclusively establish that Defendant breached his duty of loyalty to the Plan when he invested in Sarissa in 2011.

In 2012, Defendant, on behalf of the Plan, made a $120,000.00 investment in Sarissa. Defendant was admittedly leery of investing the vast majority of the Plan's remaining assets into Sarissa because he did not want to have "all the Plan's eggs in one basket." Therefore, rather

than invest the Plan's money directly, he purportedly loaned the money to himself and promised that, if the investment were successful, the Plan would reap the benefits. The terms of the loan included a re-payment plan as well as collateral. The record shows Sarissa needed capital so that a "Chinese deal" could go through, which would significantly raise the value of Sarissa. The "loan" and subsequent investment took place in August 2012, and the Chinese deal was supposed to be finalized in September 2012.

Defendant claims in a letter to Plaintiff that he "believed that the collateral provided and [his] credit worthiness . . . provided more than sufficient proof or repayment." *See* Dkt. No. 40-6 at 5. Remarkably, Defendant alleges that "the transaction was entered in the best interests of the Plan as that transaction's terms provided the Plan with a significant premium return and further upside capital gains potential without the corresponding risk associated with it." *See id*. However, the notion that the loan's terms were in the best interest of the Plan strains credulity. Rather, the circumstantial evidence leads to one conclusion: Defendant made the loan so that he could help Sarissa close a deal. Clearly Defendant knew that it would not be in the Plan's best interest to invest the remainder of its capital in Sarissa. Nonetheless, rather than simply investing his own funds in Sarissa, Defendant loaned himself the Plan's money to provide Sarissa the capital it needed. The only contrary evidence is Defendant's self-serving statements. Under these factual circumstances, no reasonable jury could find that Defendant entered into this transaction for the exclusive purpose of benefiting Plan participants.

Therefore, the Court finds that Defendant breached his duty of loyalty with respect to the 2011 and the 2012 investments and grants Plaintiff's motion for summary judgment with regard to this issue.

## 2. Duty of prudence

"Prudence," within the meaning of ERISA, "'is measured according to the objective prudent person standard developed in the common law of trusts.'" *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quotation omitted). The fiduciary's obligation is to exercise care prudently and with diligence "under the circumstances then prevailing," 29 U.S.C. § 1104(a)(1)(B); therefore, the court is directed to "'judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight,'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("*St. Vincent*") (quoting *In re Citigroup [ERISA Litig.*,] 662 F.3d [128,] 140 [(2d Cir. 2011)]). "In short, ERISA's 'fiduciary duty of care . . . requires prudence, not prescience.'" *Id.* (quoting *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)).

The test of ERISA prudence "focuses on the trustee's conduct in investigating, evaluating and making the [challenged] investment." *United States v. Mason Tenders Dist. Council of Greater New York*, 909 F. Supp. 882, 886 (S.D.N.Y. 1995) (citation omitted). "ERISA's prudence standard 'is not that of a prudent lay person but rather that of a prudent fiduciary with experience dealing with a similar enterprise.'" *Id.* (quotation and other citations omitted). In fact, a fiduciary's "lack of familiarity with investments is no excuse . . . [because he is] to be judged 'according to the standards of others "acting in a like capacity and familiar with such matters."'" *Id.* (quoting *Katsaros v. Cody*, 744 F.2d [270,] 279 [(2d Cir. 1984)] (quoting *Marshall v. Glass/Metal Ass'n*, 507 F. Supp. 378, 384 (D. Haw. 1980))) (other citation omitted). Thus, under ERISA, the fiduciary is generally required "'(1) to employ proper methods to

investigate, evaluate and structure the investment; (2) to act in a manner as would others who have a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment decisions.'" *Id*. (quoting *Lanka v. O'Higgins*, 810 F. Supp. 379, 387 (N.D.N.Y. 1992)).

Further clarifying the prudent person standard, ERISA's implementing regulations require that the fiduciary give "appropriate consideration" to whether an investment "is reasonably designed, as part of the portfolio . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment[.]" 29 C.F.R. § 2550.404a–1(b)(2)(i). As this regulation makes clear, "'trustees must investigate proposed investments with regard to risk and return as well as appropriateness in light of the composition and aims of a fund's portfolio.'" *State St. Bank & Trust*, 842 F. Supp. 2d at 646 (quoting *Liss v. Smith,* 991 F. Supp. 278, 298 (S.D.N.Y. 1998)). Moreover, "when a fiduciary has dual loyalties, his independent investigation into the basis for an investment decision which presents a potential conflict of interests must be both intensive and scrupulous and must be discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan." *Donovan v. Bierwirth*, 538 F. Supp. 463, 470 (E.D.N.Y. 1981) ("*Bierwirth I*"), *modified*, 680 F.2d 263 (2d Cir. 1982).

In this case, Plaintiff has presented significant evidence indicating that Defendant failed to complete a reasonable investigation prior to investing in Sarissa. First, Defendant invested in Sarissa despite acknowledging its riskiness. *See* Dkt. No. 40-6 at 4; *see also* Dkt. No. 40-2 at ¶¶ 49-50 (Defendant wrote a letter admitting that Sarissa's status as an over-the counter-stock means that "its regulatory requirements are lower than some investors may deem appropriate," which "could be interpreted as a potential grounds for the purchase of Sarissa stock to be

imprudent").  Sarissa is traded on the over-the-counter market, which has less regulatory requirements than a listed exchange and does not require extensive disclosures.  The Plan's custodian, Wells Fargo, determined that any trading in Sarissa was imprudent and advised Defendant not to invest in the company.  Furthermore, in 2011 when Defendant made the investment, Sarissa was a non-revenue producing, development-stage mining project, which showed negative cash-flow, did not hold regular board meetings, did not have a business plan, was a one-man-show run out of an office building where its CEO operated several other companies, had not extracted any niobium, had not completed the geological work to meet regulations, had no mining infrastructure, needed at least $200,000,000.00 in capital to move forward, and whose management advised Defendant to use false information to circumvent regulations.  *See* Dkt. No. 40-2 at ¶¶ 27, 31, 33, 34, 36-38, 43, 44.

Moreover, the record indicates that Defendant based his decision to invest in Sarissa on oral pronouncements of potential growth and his own experience as a financial advisor rather than on objective, documentary evidence.  Defendant admits that, prior to making the 2011 investment decision, he only reviewed three sources, including (1) a non-disclosure agreement (which facilitated oral communication between Defendant and the CEO of Sarissa); (2) the 2011 subscription agreement; and (3) Gulf Dominion's 1960 report.[5] *See* Dkt. No. 40-20 at 1.

Additionally, Defendant sent an email to Sarissa's managers indicating that Defendant had concerns about investing in Sarissa; yet, despite these concerns, he invested in a hasty

---

[5] There was, in fact, not much else for Defendant to review, as Sarissa "(1) did not report to the SEC; (2) did not provide [Defendant], or anyone who participated in the 2011 private placement, with a prospectus, an offering memorandum, or advertising literature; (3) did not make available a written business plan, and may not have had one; and (4) even after [Defendant] signed a non-disclosure agreement, Sarissa gave him only one non-public document: a report written in the early 1960s detailing Gulf Dominion's contemporaneous studies of Sarissa's property."  *See* Dkt. No. 40-1 at 15 (internal citation to the record omitted).

manner.  *See* Dkt. No. 40-8 at 3.  Defendant's legitimate concerns highlight the utter lack of documentary evidence that might suggest that investing in Sarissa was a prudent decision. Further, Defendant's admission that all his questions were answered in a telephone conversation with Sarissa's then-CEO Scott Keevil confirms that Defendant relied disproportionately on management instead of carefully and independently scrutinizing the wisdom of the 2011 investment.

Defendant admitted that the only new document on which he relied in 2012 was a news article in which Sarissa announced it was close to forming a joint venture with a group of Chinese investors.  *See* Dkt. No. 40-2 at 2.  Given Defendant's admission that he "knew through experience that financing deals are not guaranteed," his decision to invest an additional $120,000.00 of the Plan's assets was objectively imprudent because it put 95% of the Plan's portfolio into a single, risky asset.  Defendant points to no evidence that he considered any alternatives to the loan as an investment, considered the loan's terms in relation to the needs of the Plan beneficiaries, or generally examined the loan with an eye single on whether it was the right decision for the Plan.  In short, Defendant's rush to invest never afforded him the opportunity to scrutinize the Plan's investment.

As previously stated, the regulations make clear that "'trustees must investigate proposed investments with regard to risk and return as well as appropriateness in light of the composition and aims of a fund's portfolio.'"  *State St. Bank & Trust*, 842 F. Supp. 2d at 646 (quotation omitted).  In this case, Defendant's decision to invest 95% of the Plan's funds into a single penny-stock almost exclusively on oral pronouncements from Sarissa's upper management objectively fell short of his fiduciary duty of prudence.  In sum, there was nothing "intensive" or

"scrupulous" about Defendant's investigation regarding whether to invest in Sarissa. *Bierwirth I*, 538 F. Supp. at 470.

Therefore, the Court finds that the undisputed facts show that Defendant violated his duty of prudence and grants Plaintiff's motion for summary judgment with regard to this issue.

### 3. Duty to diversify

"ERISA section 404(a)(1)(C) requires fiduciaries to 'diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.'" *State St. Bank & Trust*, 842 F. Supp. 2d at 650 (quoting 29 U.S.C. § 1104(a)(1)(C)).  Moreover, "[a] fiduciary's performance of the duty to diversify 'may be measured by the diversity it has achieved in a particular investment vehicle . . . .'" *Id.* (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 438–40 (3d Cir. 1996)).  Finally,

> Congress has instructed that "[t]he degree of investment concentration that would violate this requirement to diversify cannot be stated as a true percentage, because a prudent fiduciary must consider the facts and circumstances of each case.  The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographic location; (6) distribution as to industries; (7) the dates of maturity."

*In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 438 (3d Cir. 1996) (quoting [H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S. Code Cong. & Admin. News U.S.C.C.A.N. 5038,] 5085).

In this case, Defendant invested 95% of the Plan's assets in one company.  The Plan's portfolio has no diversity in types of investments or dates of maturity, nor does it have diversity as to industries or geographic distribution.  Furthermore, the vast majority of the Plan's assets are restricted securities, and it would be difficult to liquidate them in the event that Plan participants

requested their money. In short, the record overwhelmingly supports a finding that Defendant breached his duty to diversify. [6] Defendant's decisions in 2011 and 2012 took a Plan that was invested in various mutual funds to where it is now, invested nearly completely in one, non-revenue producing, development stage mining company.

Although a fiduciary may avoid liability for failing to diversify if the fiduciary can show that "it is clearly prudent not to" diversify, 29 U.S.C. § 1104(a)(1)(C), Defendant has not made the requisite showing here. *See State St. Bank & Trust*, 842 F. Supp. 2d at 652; *Reich v. King*, 861 F. Supp. 379, 384 (D. Md. 1994) (stating that "Defendants' task is 'not merely to prove that the investment is prudent, but that there is no risk of large loss resulting from the non-diversification'" (quoting *Glass/Metal Ass'n,* 507 F. Supp. at 384)).

Therefore, the Court finds that Defendant violated his duty to diversify and grants Plaintiff's motion for summary judgment with regard to this issue.

---

[6] Defendant makes the remarkable claim that the investment in Sarissa represents diversification among "commodity type investments" because Sarissa owns property that might have mining potential in different metals. *See* Dkt. No. 46 at 3. Defendant is mistaken regarding the fundamental concept of diversification. "The purpose of diversification is to 'distribute the risks of loss in order to maintain the [plan's] principal, usually by limiting the proportion of total [plan] assets invested in any one stock or class of securities.'" *Brock v. Citizens Bank of Clovis*, No. Civ. 83-1054, 1985 WL 71535, *2 (D.N.M. Dec. 20, 1985), *aff'd*, 841 F.2d 344 (10th Cir. 1988) (quoting G. Bogert, The Law of Trusts & Trustees § 612 at 18 (Rev. 2d ed. 1980)). Diversification thus involves much more than investing in a single company that has multiple lines of business. It involves purchasing stocks, bonds, commodities, real estate, and other investments in a manner to reduce the "risk" of investing in a single asset or single class of assets. Indisputably, 95% of the Plan's assets are currently invested in a single asset -- the antithesis of diversification.

**C.     Remedies**

*1. Restitution to the Plan*

Section 409 of ERISA provides, in pertinent part, that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach[.]"  29 U.S.C. § 1109(a).  Accordingly, "[c]ausation of damages is . . . an element of the claim, and the plaintiff bears the burden of proving it."  *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir. 1998) (Jacobs, C.J., concurring).  An "appropriate remedy in cases of breach of fiduciary duty is the restoration of the [plan] beneficiaries to the position they would have occupied but for the breach of trust."  *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("*Bierwirth III*") (citations omitted).  "If, but for the breach, the Fund would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable."  *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989).

Plaintiff employed an expert, who prepared a financial analysis and concluded that there is a $314,818.00 difference in how the Plan actually performed and how the Plan would have performed had Defendant properly administered it.  *See* Dkt. No. 40-17 at 4.

To arrive at this sum, Plaintiff's expert calculated the *Lost Principal* by taking the total portfolio value as of December 31, 2010 ($221,129) and subtracting the total portfolio value as of December 31, 2015 ($50,083),[7] which resulted in a lost principal of $171,091.  Plaintiff's

---

[7] This calculation is incorrect.  The total portfolio value as of December 31, 2015, was actually $50,038.  It appears that the expert transposed the 8 and the 3 in arriving at this sum.

expert determined the total portfolio value as of December 31, 2015, by estimating the market price of Sarissa at $0.0038 per share, which was added to the cash still in the account.

The expert then calculated the *Lost Use* of funds by taking the total alternative value of the total portfolio as of December 31, 2015 ($364,856) and subtracting the total portfolio value as of December 31, 2010 ($221,129), which resulted in a lost use of funds of $143,727. Plaintiff's expert calculated the total alternative value by assuming that, rather than investing in Sarissa in 2011 and 2012, the Plan would have invested $100,000 in the S&P 500 Index in 2011, and $120,000 in the S&P 500 Index in 2012. *See* Dkt. No. 40-17 at 13. In sum, according to Plaintiff, the losses resulting from Defendant's breach include both the lost principal ($171,091) and lost use ($143,727), which equal $314,818. *See id.* at 14.

It is clear based on the current value of Sarissa compared to the value of the Plan in 2010, that the Plan suffered a loss as a result of Defendant's investments in Sarissa. *See Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) (stating that, "'[i]f, but for the breach, the [plan] would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable'" (quotation omitted)). However, assuming that the Plan would have made two separate investments in 2011 and 2012 in the S&P 500 Index is an improper means to determine the lost potential earnings for the Plan. Losses are measured by the difference between the actual performance and how the plan would have performed if the funds had been invested "like other funds being invested during the same period in proper transactions." *Bierwirth III*, 754 F.2d at 1056.

The Plan had been maintaining Wells Fargo's relatively conservative investment approach of a diversified portfolio of various mutual funds. Although, as Plaintiff points out, the Court "should presume that, but for the breach, the funds would have been invested in the most

profitable of the alternatives[,]" *Dardaganis*, 889 F.2d at 1244, the Court cannot ignore the reality of the Plan's previous investment strategy, especially when there is no indication that the Plan would have made alternative investments in 2011 and 2012, much less solely in the S&P 500 Index. Defendant asserts, correctly, that prior to investing in Sarissa, the Plan owned a diversified base of mutual funds that contained "real estate funds, multiple bonds funds, [and] income funds" among others, which are dissimilar to the S&P 500 Index. *See* Dkt. No. 45 at 7; *see also* Dkt No. 40-17 at 8. Thus, Plaintiff does not convincingly argue that the S&P 500 Index is the proper basis to compare the Plan's performance before and after the investments.

Therefore, the Court instructs the parties to provide supplemental briefing with regard to the proper calculation of damages. In this regard, the Court instructs the parties to consider an up-to-date valuation of the Plan's shares in Sarissa compared to how the Plan would have performed under the strategy previously employed, i.e., investing in various mutual funds.

### 2. Permanent injunction

ERISA Section 409 provides, in pertinent part, that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a). "'Where there has been a breach of fiduciary duty, ERISA grants to the courts broad authority to fashion remedies for redressing the interests of participants and beneficiaries.'" *Liss v. Smith*, 991 F. Supp. 278, 312 (S.D.N.Y. 1998) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir. 1983)) (other citation omitted). The removal of a fiduciary "and the appointment of a person to serve in their stead is appropriate under the statute when [the fiduciary has] engaged in 'repeated or substantial

violation[s] of [his] responsibilities.'" *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984) (quoting *Marshall v. Snyder*, 572 F.2d 894, 901 (2d Cir. 1978)); *see also Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987) (stating that "[t]he likelihood that a fund's assets will be unnecessarily diminished is greatly increased when its trustees show a propensity to engage in imprudent conduct"). "Other appropriate relief includes permanent injunctive relief prohibiting defendants from serving as fiduciaries or service providers to any ERISA plan[.]" *Liss*, 991 F. Supp. at 312 (citing *Beck v. Levering*, 947 F.2d 639, 641–42 (2d Cir. 1991)) (other citation omitted).

This case presents a uniquely appropriate situation to order an injunction removing Defendant as trustee of the Plan for three reasons. First, as explained above, Defendant egregiously violated his fiduciary duties by approving the investment of 95% of the Plan's assets into a penny-stock without properly investigating the merits of that decision and basing his decision almost exclusively on oral pronouncements from managers. *See Chao v. Merino*, 452 F.3d 174, 185 (2d Cir. 2006) (approving a permanent injunction for egregious violations of trustee's fiduciary duties). Second, Defendant currently is employed as the President of Sarissa; and, therefore, it is apparent that he would be unable to evaluate the Plan's continued investment in Sarissa properly. Finally, Defendant has failed to administer the Plan in a meaningful way for the past decade, and "refus[al] to actively administer the fund" is sufficient grounds to remove Defendant from serving as a fiduciary to this Plan or any ERISA-covered employee benefit plan. *Perez v. Sajovic*, No. 14-CV-01922, 2014 WL 6983445, *4 (E.D.N.Y. Dec. 10, 2014).

Therefore, the Court finds it appropriate to grant Plaintiff's motion to remove Defendant as trustee of the Plan and permanently enjoin him from serving as a fiduciary in the future for any ERISA-covered employee benefit plan. In light of this decision, the Court instructs Plaintiff

to file a letter brief setting forth his recommendation regarding who should replace Plaintiff as trustee of the Plan and the qualifications of said individual. *See e.g., Chao v. Azon Employees Ret. Plan*, No. 3:06-CV-1006, 2007 WL 4287784, *4 (N.D.N.Y. Dec. 4, 2007) (accepting the plaintiff's requested replacement as fiduciary).

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment, *see* Dkt. No. 40, is **GRANTED as to liability**; and the Court further

**ORDERS** that the parties shall file and serve documentation to support their arguments regarding the calculation of restitution damages consistent with this Memorandum-Decision and Order. In this regard, Plaintiff shall file and serve his documentation no later than fourteen (14) days after the date of this Memorandum-Decision and Order, and Defendant shall file and serve his response to Plaintiff's documentation no later than fourteen (14) days after Plaintiff files and serves his documentation; and the Court further

**ORDERS** that Defendant is removed as trustee of the Fort Orange Capital Management, Inc. Profit Sharing Plan; and the Court further

**ORDERS** that Defendant is permanently enjoined from serving as a fiduciary in the future for any ERISA-covered plan; and the Court further

**ORDERS** that Plaintiff shall file and serve a letter brief setting forth his recommendation regarding who should replace Defendant as trustee of the Plan, his reasons for that

recommendation, and the qualifications of said individual no later than fourteen (14) days after

the date of this Memorandum-Decision and Order.

**IT IS SO ORDERED.**

Dated: March 28, 2017
       Syracuse, New York

                                       Frederick J. Scullin, Jr.
                                       Senior United States District Judge